1

Basil P. Fthenakis, Esq. (88399)
CRITERION LAW
2225 E. Bayshore Road, Suite 200
Palo Alto, California 94303
Tel. (650) 352-8400
Fax. (650) 352-8408
bpf@criterionlaw.com

2

3

4

Of counsel:

5

6

David S. Godkin
James E. Kruzer
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100
godkin@birnbaumgodkin.com
kruzer@birnbaumgodkin.com

7

8

9

10

11

Attorneys for Plaintiff,
SIX4THREE, LLC, a Delaware
limited liability company

12

13

14

UNITED STATES DISTRICT COURT

15

NORTHERN DISTRICT OF CALIFORNIA

16

17

SIX4THREE, LLC, a Delaware limited
liability company,

18

       Plaintiff,

19

v.

20

FACEBOOK, INC., a Delaware corporation,

21

MEDIA TEMPLE INC., a Delaware
corporation,

22

23

       Defendants.

24

Case No. 3:16-cv-06716 JCS

PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER;
MEMORANDIUM IN SUPPORT OF
MOTION

25

26

27

28

29

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                    <u>Page</u>

<u>AMF, Inc. v. Sleekcraft Boats,</u>
    599 F.2d 341 (9th Cir. 1979)................................................  8

<u>Avery Dennison Corp. v. Sumpton,</u>
    189 F.3d 868 (9th Cir. 1999)................................................  10

<u>Bosley Medical Institute, Inc. v. Kremer,</u>
    403 F.3d 672 (9th Cir. 2005)................................................  9, 11, 12

<u>Braun v. Chronicle Publ'g Co.,</u>
    52 Cal. App.4th 1036, 61 Cal. Rptr.2d 58 (1997) ....................  6

<u>Brookfield Communications, Inc. v. West Coast Entertainment Corp.,</u>
    174 F.3d 1036 (9th Cir. 1991)................................................  9

<u>Dreamworks Production Group, Inc. v. SKG Studio,</u>
    142 F.3d 1127 (9th Cir. 1998)................................................  8

<u>Entrepreneur Media, Inc. v. Smith,</u>
    279 F.3d 1135 (9th Cir. 2002)................................................  8, 9

<u>Huthwaite, Inc. v. Sunrise Assisted Living, Inc.,</u>
    261 F.Supp.2d 502 (E.D.Va. 2003)................................................  10

<u>Lang v. Ret. Living Publ'g Co., Inc.,</u>
    949 F.2d 576 (2d Cir.1991) ................................................  11

<u>Mattel Inc. v. MCA Records, Inc.,</u>
    296 F.3d 894 (9th Cir. 2002)................................................  6, 11

<u>Mindys Cosmetics, Inc. v. Dakar,</u>
    611 F.3d 590, 595 (9th Cir. 2010) ................................................  6

<u>Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,</u>
    469 U.S. 189 (1985)................................................  7

<u>Procter & Gamble Co. v. Amway Corp.,</u>
    242 F.3d 539 (5th Cir. 2001) ................................................  11

<u>See Equilon Enters., LLC v. Consumer Cause, Inc.,</u>
    29 Cal.4th 53, 124 Cal. Rptr.2d 507, 52 P.3d 685 (2002) ........................  6

<u>TMI, Inc. v. Maxwell,</u>
    368 F.3d 433 (5th Cir. 2004) ................................................  11

<u>United States ex rel. Newsham v. Lockheed Missiles & Space Co.,</u>
    190 F.3d 963 (9th Cir. 1999) ................................................  6

**<u>Cases</u>**                                                                                                       **<u>Page</u>**

<u>Wilcox v. Superior Court</u>,
    27 Cal.App.4th 809, 33 Cal.Rptr.2d 446 (1994)) ........................................................  6

**<u>Other Authorities</u>**

15 U.S.C. § 1125(a)(1). ....................................................................................................  8

15 U.S.C. § 1125(c) ........................................................................................................  10

15 U.S.C. § 1125(c)(3)(c) ...............................................................................................  10

15 U.S.C. § 1125(c)(3)(A)(ii). ........................................................................................  12

15 U.S.C. § 1051 ..............................................................................................................  7, 11

Cal. Civ. Proc. Code § 425.16 .........................................................................................  4, 5, 6

Fed. R. Civ. P. 65 .............................................................................................................  1

Fed. R. Civ. P. 65(b) ........................................................................................................  4

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE THAT** at a time and place determined by the Court, Plaintiff will and hereby does move for a temporary restraining order pursuant to Fed. R. Civ. P. 65.

Plaintiff seeks a temporary restraining order enjoining Defendants Facebook, Inc. ("Facebook") and Media Temple Inc. ("Media Temple"), their officers, agents, servants, employees, contractors, attorneys, and all those in active concert or in participation with Defendants, including any third parties Defendants may contact to assist them in this matter, from suspending, removing or altering in any way the gripe site FacebooksAppEconomy.com (the "Site"). This motion is made on the ground that immediate and irreparable injury will result to Plaintiff and the public unless a temporary restraining order is issued.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   FACTUAL BACKGROUND

This is a civil action for declaratory and injunctive relief to vindicate the rights of 643 in connection with a gripe site maintained at FacebooksAppEconomy.com (the "Site"). FacebooksAppEconomy.com serves as an information resource for software developers, and in particular small businesses ("Developers"), that have been impacted by Facebook's unfair and deceptive practices. Small businesses that have been impacted can use the website to sign up for updates that follow the course of ongoing litigation and learn how they may protect their rights. See Plaintiff's First Amended Complaint for Declaratory Judgment and Injunctive Relief, ¶1 ("First Amended Complaint").

The Site also serves as a forum for increased public awareness of the harm caused by a lack of regulation in application economies. This is an issue of great importance to the public, the legal system and the global economy. Today, some of the largest economies in the world have

their rules made and monitored by companies who also get to play in the game. This aligns incentives naturally toward anti-competitive behavior that detrimentally impacts both small businesses and consumers. See Declaration of Theodore Kramer in Support of Motion for Temporary Restraining Order, ¶12 ("Kramer Declaration"); First Amended Complaint, ¶1.

Facebook's application economy in particular has experienced a series of anti-competitive transfers of wealth. The Site focuses on a major one that impacted thousands of businesses, people and families: the closing of the Open Graph announced on April 30, 2014 in which Facebook gave itself a monopoly on building applications spanning numerous industries after promising for years that Developers could build the same applications and compete on neutral terms. See First Amended Complaint, ¶1.

The Site offers a proposal for regulating Facebook's $227 billion economy in order to prevent events like this from happening again. The Site's proposal seeks to establish a basic set of rights and obligations for everyone participating in Facebook's application economy with the goal of minimizing perverse incentives towards anti-competitive behavior, which harms the public interest and threatens the long-term viability of the economy itself. In doing so, the Site seeks to engage the public and legal community not only to support the proposal but also to participate in its evolution. See First Amended Complaint, ¶1.

643 is an image recognition software startup that built an application integrated with Facebook's operating system, known as Facebook Platform. Like many Developers, 643 invested substantial sums of time, money and resources in building an application on Facebook Platform. In doing so, 643 reasonably relied upon years of explicit promises from Facebook regarding its commitment to neutrality, fairness and competition on Facebook Platform. On April 30, 2014, Facebook broke the promises it had made to Developers for many years and closed off

their access to many types of applications that they had already made substantial investments in building and maintaining. Many companies were affected by this "bait and switch" tactic, and as noted by *The Wall Street Journal*, a substantial number of these companies were forced to shut down.[1] See First Amended Complaint, ¶2.

In April 2015, 643 filed a complaint in the Superior Court of California, County of San Mateo ("Ongoing Litigation"). In June 2016, the Court denied Facebook's demurrer as to four causes of action promulgated by 643, including a cause of action under California's Unfair Competition Law (UCL) and scheduled the matter for trial in Spring 2017. See Kramer Declaration, ¶8. 643 proposed that Facebook implement a series of policy changes as part of a proposal to promote fairness and competition in Facebook's application economy. Facebook refused to discuss these measures with 643. In an effort to raise awareness of this important issue of anti-competitive behavior in application ecosystems, 643 notified Facebook of the Site, including its intention to engage the developer community around this issue to garner support for its proposal. See First Amended Complaint, ¶3.

On 11 November 2016, Facebook sent a Notice of Trademark Infringement to 643, attached to the First Amended Complaint and Kramer Declaration as Exhibit A. In its Notice, Facebook claims that 643's registration and use of the Site violates the Lanham Act (15 U.S.C. § 1051 *et seq.*) and infringes and dilutes the famous Facebook trademark. The Notice requests that 643 remove the Site and let its domain registration lapse or Facebook "will have no choice but to pursue all available remedies against [643]". See First Amended Complaint and Kramer Declaration, Exhibit A.

---

[1] See: "Facebook's Restrictions on User Data Cast a Long Shadow," *The Wall Street Journal*, at http://www.wsj.com/articles/facebooks-restrictions-on-user-data-cast-a-long-shadow-1442881332

On 20 December 2016, Media Temple, the hosting provider for the Site, sent notice that it would suspend the site within 24 hours based on a formal complaint submitted by Facebook. See First Amended Complaint and Kramer Declaration, Exhibit B.

643 therefore brings this declaratory relief action to clarify the rights of the parties, and to refute the baseless assertions of trademark infringement and trademark dilution finally and definitively, and to seek a temporary restraining order and preliminary and permanent injunction against any suspension or removal of the Site or its related domains. Plaintiff seeks a declaratory judgment holding that the Site does not infringe any trademarks held by Defendant Facebook and is protected by the Fair Use Doctrine, California's Anti-SLAPP Law (Cal. Civ. Proc. Code § 425.16), and the First Amendment of the United States Constitution. 643 also seeks temporary, preliminary and permanent injunctive relief enjoining Defendant Facebook from any efforts to enforce any trademark in the Facebook trademark against 643 and the Site, including through the use of DMCA takedown notices, WIPO arbitration, or otherwise, and including a preliminary injunction and temporary restraining order prohibiting Defendant Media Temple or other third parties contacted by and working in concert with Facebook from suspending or altering the Site or any related domains.

## II.   ARGUMENT

### a.   TRO Standard

The Court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney if specific facts in an affidavit clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required. Fed. R. Civ. P. 65(b). As set forth in the Declaration

of David S. Godkin, movant's attorney has certified in writing that notice has been provided to Facebook's counsel and to Media Temple.

          **b.**      **Plaintiff and the Public will Suffer Immediate, Irreparable Injury Absent a TRO**

          **1.**      **Facebook Is Attempting to Chill Free Speech Protected Under the First Amendment of the United States Constitution and California's anti-SLAPP Statute**

Upon information and belief, Facebook sent its Notice of Trademark Infringement to 643 with full knowledge of the intended purpose of the Site, a purpose that is evidently both non-commercial in nature and of great importance to the economy and legal community. Facebook knew of this intended purpose because 643 communicated it to Facebook in advance of and during a court-mandated mediation on 8 November 2016. See First Amended Complaint, ¶3. As such, Facebook's Notice was designed to create a chilling effect intended to suppress 643's free speech and activities in furtherance of a matter of great importance to the public. The First Amendment to the Constitution of the United States and California's Anti-SLAPP law (Cal. Civ. Proc. Code § 425.16) prohibit conduct intended to create this kind of "chilling effect" around issues of great public importance, particularly when the activities are in connection with a judicial proceeding and an overt campaign to raise awareness among lawmakers and regulators of a great injury to small software businesses founded and operating in the United States. In an effort to prevent 643 from raising awareness of this issue, Facebook has lashed out and accused 643 of trademark infringement and dilution. Plaintiff must be permitted to raise awareness of this critical issue that ensures this relatively new and innovative application economy is subjected to the same rule of law as every other industry on the planet.

Courts and legislatures have made clear that it is not appropriate to use trademark infringement and trademark dilution protection for the purpose of intimidation tactics designed to

prevent discussion of issues of great public importance. "The First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." See Mattel Inc. v. MCA Records, Inc., 296 F.3d 894, 900 (9th Cir. 2002).

In 1993, the California legislature enacted the Anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute. Cal.Civ.Proc.Code § 425.16(a). The anti-SLAPP statute is "designed to allow courts 'to promptly expose and dismiss meritless and harassing claims seeking to chill protected expression.'" Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 595 (9th Cir. 2010) (quoting Bosley, 403 F.3d 672, 682). "The hallmark of a SLAPP suit is that it lacks merit, and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned, and of deterring future litigation." United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 970-971 (9th Cir. 1999) (citing Wilcox v. Superior Court, 27 Cal.App.4th 809, 814-817, 33 Cal.Rptr.2d 446, 449-50 (1994)). Here, 643 has made an initial prima facie showing that its First Amended Complaint "arises from an act in furtherance of [its] right of petition or free speech." Braun v. Chronicle Publ'g Co., 52 Cal.App.4th 1036, 1042-43, 61 Cal.Rptr.2d 58, 61 (1997). Further, 643 need not show that Facebook's actions were intended to chill defendant's speech. Facebook's "intentions are ultimately beside the point". See Equilon Enters., LLC v. Consumer Cause, Inc., 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 519, 52 P.3d 685, 694 (2002). Given that the anti-SLAPP statute was designed precisely to prevent the kind of conduct in which Facebook is now engaged, Plaintiff is highly likely to succeed on the merits of its First Amended Complaint.

c.   **Plaintiff Will Suffer Irreparable Injury if the Site is Taken Down**

Plaintiff has invested substantial resources of time and money in developing the Site and the related content, including custom-made documentary videos totaling over 35 minutes. See Kramer Declaration, ¶14. The purpose of this investment of time and money is for Plaintiff to raise awareness of the harm caused by a lack of regulation in application economies, to identify other businesses who have suffered such harm, and to generate a movement to fight against this injustice that has caused a massive transfer of wealth to Facebook from small businesses and the families they support. See Kramer Declaration, ¶¶12, 14. If the Site were to be shut down even for any period of time, Plaintiff's substantial investment would be irreparably harmed as various stakeholders who have taken interest in Plaintiff's efforts are currently reviewing and sharing the Site with their advisors and stakeholders. See Kramer Declaration, ¶14. Further, the public and thousands of small businesses who have been impacted by Facebook's tactics would be irreparably harmed by these intimidation tactics designed to prohibit their free expression and advocacy for fairness and competition in software application ecosystems. See Kramer Declaration, ¶¶7, 8, 12, 14.

d.   **Plaintiff Is Likely To Succeed On the Merits of its Declaratory Judgment Claims**

643 is likely to succeed on its claims for declaratory relief because Facebook is not likely to prove trademark infringement as it has threatened. "The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189 (1985). Accordingly, the Act provides for civil liability against "[a]ny person who, on or in connection with goods or services…uses in commerce any word, term, name, symbol, or device, or any combination thereof…., which (A) is

likely to cause confusion…as to the origin, sponsorship, or approval" of the goods or services. 15

U.S.C. § 1125(a)(1).

Here, the parties dispute whether the use of the Facebook trademark is "likely to cause

confusion" as to Facebook's products and services' "origin, sponsorship, or approval". "The test

for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is

likely to be confused as to the origin of the good or service bearing one of the marks."

Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1140 (9th Cir. 2002) (quoting

Dreamworks Production Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998)).

In AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), the Ninth Circuit

developed an eight-factor test to guide determinations about likelihood of confusion.

Enterpreneur Media, 279 F.3d at 1140. The Sleekcraft factors are:

1. The strength of the trademark;

2. The similarity of the marks;

3. The proximity or relatedness of the goods or services;

4. Intent in selecting the marks;

5. Evidence of actual confusion;

6. The marketing channels used;

7. The likelihood of expansion of product lines; and,

8. The degree of care consumers are likely to exercise.

Entrepreneur Media, 279 F.3d at 1140 (citing Sleekcraft, 599 F.2d at 348-49). In the application

of the Sleekcraft test to Facebook's threatened trademark infringement claims, the Court should

not "decide whether confusion is likely by considering mechanically the number of Sleekcraft

factors that weigh in favor of either party, or by giving the same weight to a particular factor

from case to case." <u>Entrepreneur Media</u>, 279 F.3d at 1141 (citing <u>Brookfield Communications,</u> <u>Inc. v. West Coast Entertainment Corp.</u>, 174 F.3d at 1054)). Instead, the Court should "consider what each fact, and – more importantly – what the analysis as a whole reveals about the ultimate question before us." Id. Further, in <u>Bosley Medical Institute, Inc. v. Kremer</u>, 403 F.3d 672 (9th Cir. 2005), the court held that a gripe site that hosted no advertising, did not directly link to any commercial websites, and was devoted to critical commentary was not a "use in connection with a good or service". <u>See</u> <u>Bosley</u>, 403 F.3d 672, 677.

The Site is obviously a gripe site that has no commercial purpose whatsoever. The Site does not sell advertising, it does not link to a commercial website, and it does not sell a commercial product or service. <u>See</u> Kramer Declaration, ¶9. There is no mechanism on the site or any offering in which money could exchange hands at all. <u>See</u> Kramer Declaration, ¶11. The owner of the Site has made no attempts to transfer, sell or profit in any way from the domain or the Site. <u>See</u> Kramer Declaration, ¶15. The URL of the site is clearly distinguishable from the Facebook.com URL, as the Facebook.com URL is eight characters long while the FacebooksAppEconomy.com URL is 19 characters long. It is not possible for a consumer to type in those 11 additional characters into the URL and think they were still going to the Facebook.com website. Further, Facebook does not have any product, good, trademark or other intellectual property in the term "App Economy". The use of "App Economy" is clearly intended to distinguish the Site from any good or service offered by Facebook and it is obvious simply from the URL that the Site intends to serve as a public forum for the application economy managed by Facebook. Further, upon entering the site, the first words that appear at the top of the page include phrases like "Our Demands," "Join Litigation," "Litigation Timeline," and "Join Our Effort to Protect All Facebook Developers". Finally, at the very top of the site, the

classic Facebook thumbs up trademark is turned upside down to reflect a thumbs down, clearly demonstrating a gripe with Facebook and any identical use of the Facebook mark. It is hard to imagine how someone could view the thumbs down icon and somehow still confuse the Site with any Facebook-owned property.

It is clear even from a brief glance at the Site that the <u>Sleekcraft</u> factors clearly demonstrate that the Site is unlikely to cause any confusion among Facebook's consumers. The marks are not similar as the primary Facebook thumbs up icon is turned upside down, indicating a gripe with Facebook. There are no goods or services being sold that could be confused with those offered by Facebook. The intent in selecting the marks is clearly to demonstrate a gripe with Facebook regarding an issue of great importance to the global economy, the legal system and the rights of consumers and small businesses to be protected from predatory practices that violate California law. There are two separate videos describing these predatory practices totaling over 35 minutes combined, making it clear that the Site is intending to serve as a discussion forum around a $227 billion economy that is currently not regulated by law. There are no marketing channels being used to sell a product, there is no product in which to consider an expansion of product lines, and finally, even a consumer acting recklessly would be highly unlikely to confuse the Site with any Facebook property.

Similarly, in the trademark dilution context, noncommercial speech is not actionable as dilution by blurring or dilution by tarnishment under 15 U.S.C. §1125(c). <u>See</u> 15 U.S.C. § 1125(c)(3)(C). Congress created this defense precisely to ensure that dilution claims would not impinge upon First Amendment rights, particularly around issues of great public importance that affect thousands of businesses and families who have been victims of unfair and deceptive business practices. <u>See</u> <u>Avery Dennison Corp. v. Sumpton</u>, 189 F.3d 868, 873 (9th Cir. 1999)

(the Act is designed to protect consumers who have formed particular association with a mark from buying a competing product); <u>Mattel Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 903 (9th Cir. 2002) ("Although this statutory language is ungainly, its meaning seems clear: It refers to a use of a famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner."); and <u>Huthwaite, Inc. v. Sunrise Assisted Living, Inc.</u>, 261 F.Supp.2d 502, 517 (E.D.Va. 2003) (holding that the commercial use requirement of the FTDA is "virtually synonymous with the `in connection with the sale, offering for sale, distribution, or advertising of goods and services' requirement" of the Lanham Act). As the Second Circuit held, "[t]he Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another.... [T]rademark infringement protects only against mistaken *purchasing decisions* and not against confusion generally." <u>Lang v. Ret. Living Publ'g Co., Inc.</u>, 949 F.2d 576, 582-83 (2d Cir.1991).

   The courts have interpreted this defense broadly, showing that "noncommercial" speech applies to any speech that does more than propose a commercial transaction. <u>See</u> <u>Mattel</u> 296 F.3d 894, 905-907 (non-commercial use exception to dilution extends to all non-commercial speech, even in products that are offered for sale); and <u>Procter & Gamble Co. v. Amway Corp.</u>, 242 F.3d 539, 552-553 (5th Cir. 2001) (protects the right of expression so long as the primary motive of the speaker is to express criticism, not to sell more products). Here, there is no commercial transaction to be contemplated in the first place. <u>See, e.g. TMI, Inc. v. Maxwell</u>, 368 F.3d 433, 435, 438 (5th Cir. 2004) (holding that the commercial use requirement is not satisfied where the site has no outside links); <u>Bosley</u>, 403 F.3d 672, 678 (identification of lawyers and provision of a link to same did not transform a noncommercial site into a commercial one). Further, the federal dilution statute creates a categorical exemption for "criticizing…or commenting upon the famous

mark owner or the goods or services of the famous mark owner." <u>See</u> 15 U.S.C. § 1125(c)(3)(A)(ii). <u>See also</u> Bosley, 403 F.3d 672, 679 (the "use of the…mark is not in connection with a sale of goods or services – it is in connection with the expression of [an] opinion *about*…goods and services. The dangers that the Lanham Act was designed to address are simply not at issue in this case"). Given that the Site is entirely noncommercial in nature, Plaintiff is highly likely to prevail on the merits of its First Amended Complaint.

### e.     The Existence of Serious Questions Going to the Merits Tips the Balance in Support of Granting Plaintiff's Motion

This is a textbook gripe site case. A thorough understanding of Plaintiff's legitimate gripe with Facebook, a gripe that has passed demurrer on four causes of action in California Superior Court, can be obtained simply by watching the documentary video at FacebooksAppEconomy.com/fullstory. That a California Superior Court has permitted Plaintiff to proceed on four causes of action is evidence in support of the legitimate nature of the gripe. The URL and Site have absolutely no commercial purpose, are clearly designed to avoid confusion, and support Plaintiff's efforts in ongoing litigation. There can be no doubt that the balance of hardships tips in favor of granting Plaintiff's preliminary injunction. If Plaintiff is not permitted to continue its advocacy in support of a fair and just application economy, then countless businesses and families will be impacted by a continued pattern of anti-competitive behavior that violates California and United States Law.

It is estimated that Facebook's application ecosystem produced $227 billion of economic activity and supported 4.5 million jobs in 2014 alone.[2] This application ecosystem currently operates in the absence of regulation. Facebook sets the rules of the game and is also one of its

---

[2] <u>See:</u> "New Deloitte Report Looks at Facebook's Impact on Global Economy, Jobs," 20 January 2015, at http://newsroom.fb.com/news/2015/01/new-deloitte-report-looks-at-facebooks-impact-on-global-economy-jobs/.

largest players. Facebook has taken advantage of this fact to effectuate large transfers of wealth from small businesses and consumers to itself by engaging in a series of "bait and switch" tactics that violate Section 5 of the Federal Trade Commission Act (FTCA) and California's Unfair Competition Law (UCL). Application ecosystems, or App Economies, are new and innovative industries critical to the global economy as a whole.

The rule of law has yet to catch up to these innovative economies, but many in the legal community have begun to take notice of the immense harm caused by a failure to regulate. As recently as 19 October 2016, Representative Henry C. "Hank" Johnson, the Ranking Member of the Antitrust Subcommittee of the House Judiciary Committee, called on the FTC to investigate anti-competitive behavior in App Economies. Johnson wrote: "It is critical that we promote and defend competition, even in markets that are highly innovative, to ensure that small entrants aren't squeezed out through needlessly restrictive conditions and policies…. I strongly encourage the FTC to give this issue the close attention that it deserves."[3] The Site serves a critical function in exposing how App Economies are manipulated in the absence of regulation. In doing so, the Site also identifies what we can do as a public and legal community to promote fairness and competition in these economies in order to ensure their long-term stability and protect businesses and consumers.

---

[3] See: "Johnson Leads Bipartisan Call for Investigation of Anticompetitive Practices in the App Marketplace," 19 October 2016, at https://hankjohnson.house.gov/media-center/press-releases/johnson-leads-bipartisan-call-investigation-anticompetitive-practices.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that its motion be granted, and that the

Court enter the proposed Temporary Restraining Order submitted herewith.


DATED:  December 22, 2016                    CRITERION LAW

                                             BIRNBAUM & GODKIN, LLP


                                             By:/s/ Basil P. Fthenakis
                                                  Basil P. Fthenakis, Esq.
                                                  David S. Godkin
                                                  James E. Kruzer
                                                  Attorneys for Plaintiff
                                                  Six4Three, LLC